**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AISHA PUTNAM, | ) | |
|     Plaintiff, | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | Judge: |
| CARAMELCRISP, LLC d/b/a | ) | |
| GARRETT POPCORN SHOPS, | ) | **JURY DEMANDED** |
|     Defendant. | ) | |

**COMPLAINT**

**Preliminary Statement**

1. This is a civil action against Defendant CaramelCrisp, LLC d/b/a Garrett Popcorn Shops ("Defendant") for relief for injuries Plaintiff, Aisha Putnam ("Plaintiff"), has sustained as a result of Defendant's retaliation against her in violation of the Food Safety Modernization Act, 21 U.S.C. § 399d and for retaliatory discharge in violation of the public policy of the state of Illinois.

2. Plaintiff was Defendant's former Assistant Director of Research from March of 2014 until February of 2015 and Director of Research and Development from approximately February of 2015 until March of 2019.

3. Beginning in 2014 and continuing throughout the course of her employment, until March 2019, Plaintiff was marginalized and eventually terminated after she began raising and escalating concerns about serious health and food safety issues related to defects in the manufacture, distribution, and sale of Defendant's various popcorn and chocolate products, as well as a culture and organizational structure that increasingly prioritized profits over safety and compliance.

1

**NATURE OF THE CASE**

4.    Defendant has violated Food Safety Modernization Act ("the FSMA"), 29 C.F.R. §
1987.100(a) *et seq.* and the public policy of the state of Illinois by terminating Putnam's
employment with Defendant in retaliation for her complaints of violations of the FSMA.

**JURISDICTION AND VENUE**

5.    This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1331. This Court has
supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367.

6.    This Court has jurisdiction over Plaintiff's Food Safety and Modernization Act ("FSMA")
claim pursuant to 21 U.S.C. § 399d(b)(4)(A), which permits the Plaintiff to remove her
claim from the Department of Labor to an appropriate United States District Court if the
Secretary of Labor has not issued a final decision within 210 days after Plaintiff filed her
complaint with the Occupational Safety and Health Administration ("OSHA"). Plaintiff
filed her FSMA complaint with OSHA more than 210 days ago, on August 13, 2019.Venue
is proper in the Northern District of Illinois because the events giving rise to Plaintiff's
claims for relief occurred in Cook County, Illinois.

7.    All conditions precedent have been fulfilled by Plaintiff including filing a complaint with
the Department of Labor's Occupational Safety and Health Administration ("OSHA").
(Complaint No. 5-1260-19-195)

**PARTIES**

8.    That Plaintiff is a citizen and a resident of Cook County, Illinois. At most relevant times to
this matter, she was an employee of Defendant CaramelCrisp.

9.    That Defendant CaramelCrisp, LLC has its principal office located at 401 N. Michigan
Ave. 24th Floor, Chicago, Illinois, 60611. At all times relevant to this matter, Defendant

was an employer subject to Illinois law and the anti-retaliation provisions of the Food Safety Modernization Act.

## **GENERAL ALLEGATIONS**

10.     Plaintiff incorporates the preceding paragraphs herein.

11.     That at all relevant times, Defendant was engaged in the production of various food products.

12.     That at all relevant times, Defendant's CEO, Lance Chody ("Chody") had the power to hire employees, discipline employees, recommend discipline for employees, terminate employees, and recommend termination of an employee in the interests of Defendant.

13.     That at all relevant times, Defendant's Vice President of Culinary, David Funaro ("Funaro") had the power to hire employees, discipline employees, recommend discipline for employees, terminate employees, and recommend termination of an employee in the interests of Defendant.

14.     That at all relevant times, Defendant's Senior Vice President of Operations - Domestic Maneesha Khandelwal had the power to hire employees, discipline employees, recommend discipline for employees, terminate employees, and recommend termination of an employee in the interests of Defendant.

15.     That at all relevant times, Defendant's Vice President of Human Resources Kara Nickels had the power to hire employees, discipline employees, recommend discipline for employees, terminated employees, and recommend termination of an employee in the interests of Defendant.

16. That at all relevant times, Defendant's Senior Director of Operations of the Manufacturing Plant Austin Lilley had the power to recommend discipline and termination of an employee in the interests of Defendant.

17. That at all relevant times, Defendant's Quality Assurances Manager Kelly Evola had the power to recommend discipline and termination of an employee in the interests of Defendant.

18. That at all relevant times, Chody, Funaro, Khandelwal, Nickels, Lilley, and Evola acted directly or indirectly in the interests of Defendant in relation to Plaintiff's employment.

19. That Plaintiff was hired by Defendant in approximately March 2014 as the Assistant Director of Research and Development.

20. That in February 2015, Plaintiff was promoted to Director of Research and Development ("R&D") and she worked into that capacity until her employment with Defendant was terminated in March 2019.

21. That in Plaintiff's role as Assistant Director and Director of Research and Development, Plaintiff regularly ensured that Defendant was in compliance with its obligations pursuant to the FDA Food Safety Modernization Act ("FSMA").

22. That whenever Plaintiff reasonably believed that Defendant was not in compliance with FSMA, she immediately took steps to correct any possible violations and to notify her supervisors to ensure that any errors that contributed to the possible FSMA violations would not happen again.

23. That towards the end of her employment with Defendant, when Plaintiff raised complaints with her supervisors about FSMA violations, her supervisors would fail to address the violations and would even seem irritated by her complaints.

4

**Cheese Paste Incident**

24.    In March of 2019, Defendant's Associate Director of Supply Chain and Procurement sent a message instructing Plaintiff to mix two separate vendors' respective cheese pastes together for a new cheese popcorn flavor and deliver the samples to Defendant's CEO, Lance Chody ("Chody"), immediately. The Associate Director also instructed Plaintiff to provide the new formula to Chody immediately.

25.    Plaintiff informed the Associate Director of Supply Chain that she could mix the two cheese pastes, but warned him that Defendant could not use the new formula in popcorn sold for public consumption because she had not performed necessary organoleptic shelf life testing on the formula or completed the necessary nutritional or ingredient labels.

26.    The Associate Direct of Supply Chain assured Plaintiff that Chody only wanted to taste the combination.

27.    After Plaintiff received the Associate Director's assurances, Plaintiff proceeded to make the combined cheese paste samples.

28.    That same day Plaintiff spoke with Defendant's Vice President of Culinary, David Funaro ("Funaro"), about Chody's instructions. Plaintiff explained to Funaro that the Associate Director asked her to mix two separate cheese pastes together, per Chody's order, so that Chody could taste the combination. Plaintiff asked Funaro, "What is this all about?"

29.    Funaro responded that Defendant's upper management only wanted to do a tasting. Plaintiff reiterated that Defendant could not use this formula for sale since she did not have the updated nutritional information, ingredient deck or any other organoleptic shelf life tasting. Plaintiff delivered the requested samples to the manufacturing plant later that day.

30. Upon delivering the cheese samples, Plaintiff informed Austin Lilley ("Lilley"), Defendant's Senior Director of Operation of the Manufacturing Plant, that Defendant could not mass produce the formula since Plaintiff did not have the nutritionals, ingredient deck or any organoleptic shelf life testing ready. Plaintiff informed Lilley that she also gave this warning to the Associate Director of Supply Chain and Funaro, and she wanted Lilley to know in case he received instructions to mass produce the cheese mixture for customers. Lilley thanked Plaintiff for letting him know.

31. Despite Plaintiff's warnings, she learned from an employee that Defendant began mixing and selling popcorn coated with the two-cheese paste mixture the week following her termination, in March of 2019. Defendant did not update the nutritional information on their tin pad, E-commerce, or ingredient labels to reflect this new cheese paste. Upon all information and belief, Defendant is currently selling popcorn coated with this new cheese mixture to customers.

**No Quality Assurance Manager**

32. Beginning in August 2017 and continuing throughout September 2018, Plaintiff made several requests that Defendant hire a Quality Assurances ("QA") manager for the manufacturing plant and retail popcorn shops, after the previous QA manager quit.

33. Funaro requested Plaintiff's assistance with QA issue support until Defendant chose to hire a new one. Plaintiff informed Funaro that she did not want to be involved in QA issues any longer because there was an abundance of QA issues, and nobody listened to her complaints or showed interest in fixing the issues. Furthermore, Plaintiff expressed concern to Funaro that she did not want to go to jail for failure to remedy any issues.

34. In response, Funaro reminded Plaintiff that her role was to support the company, and her rebuttal was, "Then, we need to get a QA person."

**Failure to Follow Proper Good Manufacturing Practices**

35. In September of 2018 Funaro and Lilley hired a new QA manager, Kelly Evola ("Evola"), and assured Plaintiff that QA would no longer be her concern.

36. Plaintiff warned Funaro and Lilley that if Defendant was audited, Evola did not have the requisite certifications under Preventative Quality Individual ("PCQI") and Hazard Analysis and Critical Control Points ("HACCP"). Plaintiff noted that she was extremely concerned because she did not believe the manufacturing plant was in compliance.

37. Throughout her employment with Defendant, Plaintiff observed the following:

   a. Employees talking on phones in the plant, failing to wash their hands, eating food products while working on the production line, touching garbage and then packing and producing finished goods, using the restroom without removing their smocks, and not buttoning smocks upon entering the production area.

   b. Cross contact with food allergens in the packing line and the use of the same equipment for food allergens and non-allergens and failure to follow the color-coding allergen poster for designated allergen areas.

   c. Employees left the chemical cage open and unlocked. Employees also left chemicals and tools unattended throughout the plant; employees wore hazardous accessories, such as fake nails, eyelashes, and jewelry; employees left various side entrance doors open, which exposed the plant to pest entry; employees tossed their used gloves onto food contact equipment in the production, packing, and warehouse areas.

   d. Wet tote containers were stacked and nested on top of each other following a wash and the dishwasher was not cleaning dishes properly.

   e. No metal detection was used on finished products before and after packaging.

   f. Defendant does not provide any pest-control monitoring program at its off-site storage for its product tins, product packaging, and equipment.

   g. The sink by the shipping and receiving area does not get hot water, and no one in shipping and receiving washed their hands.

   h. Water was leaking from the ceiling in the maintenance area, production line, chocolate room, compressor room and by masipack areas. There was condensation leakage from the pipes of the new air unit onto food in the kitchens where food is cooked.

    i.    A sinking floor in the chocolate room, a cracked ceiling in the tin storage area, and a sinking floor next to the exit door. Lastly, Plaintiff observed significant water spots and mold growth in several ceiling and wall areas of the plant.

38.    Even after Evola began working as QA manager in October 2018, food safety violations were not corrected, and Defendant failed to follow Good Management Practices.

39.    After Plaintiff approached Lilley and Funaro several times over the next few months about Defendant's failure to follow the law, they informed her that the QA manager, Evola, was responsible for this, not her.

40.    Plaintiff reiterated that she was the one with the PCQI and HACCP certifications and that it was still her duty to ensure that problems were addressed until she was removed from HACCP documents and Evola received her PCQI and HACCP certifications.

41.    That Defendant's failure to follow Good Manufacturing Practices occurred until Plaintiff's termination.

### Failure to Wear Smocks on the Production Floor

42.    Between February 2019 until her termination on March 7, 2019, Plaintiff complained several times to Lilley that he needed to wear his smock on the production floor until and after food production was completed. Lilley disagreed that he needed to follow these rules.

43.    Plaintiff reiterated the law and Good Manufacturing Practices clearly state that Lilley must wear protective coverage in a food manufacturing setting at all times.

44.    Despite Plaintiff's warnings, Lilley insisted that going forward, there was no need for employees to wear the smocks once food production was complete.

**Broken Side Exit Door**

45.   In approximately January or February 2019, Plaintiff complained to Lilley that a side entrance for employees, which had been broken by the local fire department after responding to a dryer fire, remained broken and needed repair because it was a fire hazard.

46.   Plaintiff told Lilley that the broken door was also a food safety hazard because it was a pest entry point, and that the door needed to be fixed immediately.

47.    Lilley told Plaintiff that since Evola did not raise the issue, that the broken door was neither a concern nor a violation of the law.

48.   Plaintiff reiterated that simply because Evola did not address this issue with Lilley does not mean it was not a concern or violation of the law.

**Lack of OSHA Training/Documentation**

49.   In November of 2018, Plaintiff complained to Lilley and Evola, as well as Lilley, Evola, and Funaro in January and February 2019, that Defendant had not provided any OSHA safety training for new and current employees.

50.   These trainings were: fork lift and pallet jack training, HazCom training for employees using chemicals, Personal Protective Equipment (PPE) training, lockout tag-out training for any employees working with equipment, training on the eye wash stations and locations (there was a broken eyewash station).

51.   Defendant failed to require updated medical exams and CLP/CDL licenses for delivery drivers.

52.   Lilley and Funaro told Plaintiff that Evola was responsible for training and it was not Plaintiff's concern whether the company is in compliance. Plaintiff reiterated that there were many new hires who needed to receive training.

53. When Evola told Plaintiff that she was new to the company and this was not Evola's job, Plaintiff explained to Evola and Lilley that it is their job to ensure Defendant's employees are safe and trained properly.

## Lack of Safety Training for Fire Drills

54. Throughout Plaintiff's employment, she told Lilley and Nickels that she was concerned that Defendant was not providing safety training and documentation for fire drills to temporary and full-time employees during the busy season (November and December).

55. At some time between December 2018 and March 2019, Plaintiff received an email from Evola that Nickels decided they no longer needed to hold safety drills.

56. Plaintiff asked why safety drills were cancelled, and Nickels told Plaintiff that she had no right to schedule safety drills. Plaintiff explained that she did have a right because she is PQCI and HACCP certified, and these drills were something she scheduled with Defendant's Previous VP of Operations.

57. Nickels told Plaintiff to stop following the laws so strictly, and Plaintiff explained that complying with the law was part of her job. Nickels claimed that Defendant was in compliance since there was a fire drill scheduled for February 2019. Plaintiff reiterated that Defendant still needed to teach all temporary and full-time employees how to find the exits and where to find fire drill and safety information in the plant.

58. Nickels told Plaintiff that Lilley would handle the training and that Plaintiff should not worry about it, but Lilley never handled the training.

59. Plaintiff reported her concerns regarding a lack of safety drill planning to Funaro, who replied that Plaintiff need not worry about it because it "was not in [her] wheelhouse."

60.     When a man entered the plant with a gun a couple days later, nobody in the back of the plant knew how to find the safety exit. Following the incident, Lilley addressed everybody in Customer Experience and stated that "No one should tell corporate about the incident since [I] [am] already in the doghouse," while laughing.

**Ceiling Leaks, Spots and Mold**

61.     During July 2018, September 2018, and February 2019, Plaintiff complained several times about ceiling leakage, waters spots, and mold from the roof and ceiling throughout the manufacturing plant walls and test kitchen every time there was heavy rain or snow.

62.     There was heavy leakage in the maintenance area, packaging area, chocolate room, and compressor room on the walls throughout the plant and test kitchen.

63.     The Third-Party Food Auditor and Plaintiff complained to Lilley on multiple occasions about several leaks and mold spots within the manufacturing plant and explained the potential risks these could have on Defendant's food.

64.     Lilley assured the Third-Party Food Auditor and Plaintiff that he would fix the problem; however, he did not.

65.     Each time there was another storm, Plaintiff complained to Lilley and on several occasions, she led Lilley through the plant to point out the leaks areas above the food product, in the maintenance area, in the chocolate room, near the packing line, in the test kitchen, and in the storage closet.

66.     On at least one occasion, the Third-Party Food Auditor helped Plaintiff show the problem areas to Lilley.

67.     After Lilley continued to lie about fixing the leaks, Plaintiff reported the leaks, water spots, and mold growth to Funaro, and explained that they posed potential food safety hazards.

68.   Each time Plaintiff reported these issues to Funaro, he responded, "Let's just focus on our area. Not anyone else's areas."

### Lack of Heat in the Manufacturing Plant

69.   Between October 2018 and January 2019, Plaintiff complained several times to Lilley and Funaro that there was no heat throughout the manufacturing plant, the upstairs test kitchen, and the offices.

70.   That Plaintiff specifically explained to them that the lack of heat made it unsafe for employees because they were getting sick, and that employees could not work around the food products with cold symptoms.

71.   Funaro laughed at Plaintiff and told her to "bundle up" in the plant.

72.   Lilley attempted to fix the issue, but Chody did not approve his request to fix the boiler.

### Inaccurate Tin Pad Labels

73.   During July and September 2018 and February 2019, Plaintiff complained multiple times that the wrong nutritional information was on the tin pads for packaging. Therefore, Defendant was not disclosing the correct information to their e-commerce consumers.

74.   In July 2018, Defendant received a complaint from the FDA that the nutritional information on the tin pads did not match the nutritional information listed on Defendant's website. Since Defendant did not have a QA manager at that time, Plaintiff responded to the FDA on Defendant's behalf to let the FDA know that the information on the website was correct. Plaintiff forwarded documents to the FDA to support her statement and assured the FDA that the new tin pad nutritional labels would be printed soon.

75.   Prior to emailing the FDA, Plaintiff notified several supervisors, including Senior Vice President of Operations – Domestic Maneesha Khandelwal ("Khandelwal") and Lilley that

Defendant was not in compliance. Plaintiff also asked a couple supervisors, including Khandelwal, when the new nutritional information would be completed.

76. The Associate Director of Supply Chain responded that the new tin pad nutritional labels would be ready within a month or two.

77. Two months later, Plaintiff emailed the Associate Director of Supply Chain and copied Khandelwal, Lilley, and another supervisor, asking for a status on the tin pad nutritional labels.

78. Plaintiff followed her email with a phone call to the Associate Director of Supply Chain, who informed Plaintiff that Defendant decided not to print new tin pad labels after all.

79. Currently, Defendant continues to use the incorrect nutritional information on the tin pads.

80. Plaintiff tried addressing this issue with Funaro, who told Plaintiff that she needed to "let it go and let corporate handle the situation."

**Unapproved Vendor**

81. In the fall of 2018, Plaintiff complained to several supervisors, including Funaro, and Khandelwal that Defendant's third party chocolate vendor was not Global Food Safety Initiative ("GFSI") compliant, did not pass Defendant's supplier audit, and did not have any quality standards in place for its food production processes.

82. After the supplier audit, Plaintiff told Khandelwal and Funaro that Defendant's third party chocolate vendor was not fit to manufacture any of Defendant's chocolate truffles or other desserts because they did not have any GFSI standards in place to verify safe development of food for Defendant's customers.

83. Plaintiff specified that Defendant's third party chocolate vendor was not fit to manufacture Defendant's chocolates due to her concerns about improper cleaning, outdated equipment,

failure to properly wash equipment, poor hand washing by employees, inadequate storage of ingredients, lack of a traceability program, employees eating on the production floor, and lack of Good Manufacturing Practices.

84. Khandelwal and Funaro told Plaintiff during a phone conference that Defendant would continue to use the same third party chocolate vendor because it is a Chicago brand and Chody liked it.

**Selling Expired Chocolates**

85. On October 2, 2018, a Distribution Supervisor reported to Plaintiff that he received instructions to repackage chocolate and place new expiration dates on the packages. The Distribution Supervisor also forwarded an email instructing the same to Plaintiff.

86. Plaintiff contacted the Production Superintendent and the Distribution Supervisor immediately after she received the Distribution Supervisor's email.

87. The Production Superintendent and the Distribution Supervisor informed Plaintiff that repackaging chocolate was Khandelwal's instruction.

88. Plaintiff contacted another Third-Party Food Auditor who informed Plaintiff that Defendant could not assign new expiration dates for chocolates since Defendant was not the vendor who produced the product. The Auditor also told Plaintiff that the unwrapped chocolates could not be repacked due to potential exposure to bacteria such as listeria, salmonella, and E. coli.

89. The Third-Party Auditor further explained to Plaintiff that the vendor who produced the chocolate would need to test the chocolates and approve a shelf life extension and provide documentation before Defendant could assign new expiration dates.

90.     Plaintiff scheduled a phone meeting with several supervisors, including Lilley, Khandelwal and the Auditor. Each of these individuals attended the phone meeting except for Khandelwal. Per Plaintiff's request, the Auditor explained why Defendant could not repackage the chocolates or have it repacked at the third-party chocolate vendor's facilities.

91.     Following the meeting, Plaintiff spoke with Funaro and repeated the points that the Auditor made during the phone meeting. Funaro agreed that Defendant could not proceed with corporate's repacking plan. Plaintiff drafted an email to several supervisors, including Khandelwal and Lilley explaining that Defendant could not repackage the chocolates.

92.     Plaintiff read a draft of this email to Funaro, who asked Putnam to add a sentence to the email stating that he agreed with her.

93.     Khandelwal responded to the email stating she received approval from Funaro for this plan in December. Funaro never replied to rebut Khandelwal.

94.     A couple days later, when Plaintiff asked Funaro why he did not correct Khandelwal, Funaro responded, "There are some battles you don't fight and if my boss tells me to do something, then I just do it. This is something I learned long ago in my career."

**Selling Returned Popcorn**

95.     In August 2018, Lilley and the Director of Customer Experience informed Plaintiff that UPS planned to return several containers of popcorn that had been shipped to a fraudulent address. Lilley and the Director of Customer Experience asked Plaintiff what to do with the popcorn when it returned to the plant. Plaintiff explained that the popcorn must be discarded because it is unlawful to resell or use any popcorn for customers once it has left the plant, pursuant to the HAACP plan and FSMA law.

96.   Plaintiff also explained that there was no way of knowing how long the returned popcorn had been sitting in UPS's non-temperature controlled vehicles, what type of temperature abuse the popcorn experienced, the overall quality of the popcorn, and if there was any bacteria currently present inside of the popcorn tins.

97.   Plaintiff advised Lilley and the Director of Customer Experience to notify Defendant's corporate team about the restrictions on reuse and resale of the popcorn. Lilley instructed the Director of Customer Experience to send an email to the team containing Plaintiff's explanation.

98.   The same day, Chody reprimanded the Director of Customer Experience over the phone for his email. The Director of Customer Experience told Plaintiff that during this phone call, Chody screamed, "It doesn't matter what [Plaintiff] said. I am not losing money."

99.   Although the Director of Customer Experience and Lilley did not want to reuse or resell the returned popcorn tins, Chody ordered the tins to be shipped to Defendant's manufacturing plant, where the tins were reshipped to specific popcorn shops to be repackaged and resold to customers.

100.  Plaintiff approached Funaro to explain why the returned popcorn could not be sold. Funaro ignored her concerns and stated, "We don't argue with the boss."

101.  After the returned popcorn was reshipped to stores, a Customer Experience Manger, remarked to Plaintiff that the customer experience team had received complaints from customers about receiving stale popcorn and boxes of popcorn that were marked with another customer's name.

**Dripping Air Conditioner**

102.     In August 2018, Plaintiff noticed that the new air conditioning unit that had been installed in the manufacturing plant was dripping water on Caramel Crisp popcorn on the cooling tables in the cooking area.

103.     Immediately after observing the dripping water, and continuing on a weekly basis until February 22, 2019, Plaintiff complained to Lilley about the hazard. Plaintiff explained to Lilley that he needed to contact the installer to fix the unit.

104.     From August 2018 to February 22, 2019, on a weekly basis, Plaintiff also warned Lilley and Funaro that there was a serious risk that the popcorn could become contaminated with salmonella or listeria. Plaintiff further explained that such contamination could lead to a recall.

105.     Each time Plaintiff complained about the potential contamination issues, Lilley and Funaro told her that Defendant's management refused to purchase a higher quality air conditioning unit that did not leak.

106.     Each time she received that explanation, Plaintiff reiterated that the condensation dripping was a food safety hazard and that it needed to be fixed as soon as possible.

107.     Based upon information and belief, Defendant has not replaced the leaking air conditioning unit.

**Unrefrigerated Butter**

108.     In July 2018, Plaintiff complained to her supervisors that Defendant's manufacturing plant was transporting butter in an unrefrigerated truck to outlying Garrett's shops (e.g. O'Hare Airport).

109.    In July 2018, Lilley asked Plaintiff to use the refrigerator in her test kitchen because one of the retailer's shops refrigerators was broken and that the off-site kitchen (OSK Plant) needed to provide them with a new refrigerator and needed to deliver butter to them daily.

110.    Plaintiff declined to let Lilley use her refrigerator since that was the only unit she had and told Lilley that they could not deliver butter in unrefrigerated trucks. Lilley acknowledged that Plaintiff was right.

111.    A couple days later, Plaintiff noticed a spare refrigerator in the plant and asked a Maintenance Worker, about the refrigerator. The Maintenance Worker told Plaintiff that he was repairing the refrigerator by putting wheels on it for the O'Hare Airport shop because it was still without a refrigerator.

112.    Plaintiff asked a supervisor at the plant, how Defendant was storing butter at the O'Hare Airport shop if it did not have a refrigerator. The supervisor told Plaintiff that Defendant was delivering butter to the shop on a daily basis, per Lilley's orders. The supervisor also told Plaintiff that she addressed her concerns to Lilley regarding non-refrigerated butter delivery during their daily meetings.

113.    When Plaintiff confronted Lilley about his order to deliver non-refrigerated butter to the O'Hare Airport shop in 80-90-degree weather, Lilley admitted that the situation was out of his control because Khandelwal instructed him to move forward with the deliveries.

114.    Plaintiff reiterated that they could not legally deliver perishable foods in a non-refrigerated truck and Lilley, again, stated that the situation was out of his control and there was nothing they could do.

**Misplaced Safety Data Sheet Books**

115. In November 2018, December 2018, and February 2019, Plaintiff complained to Lilley and Funaro that there were no Safety Data Sheet ("SDS") books available for employees to review in case of a chemical incident. These SDS books were available to employees in approximately September 2019.

116. After Plaintiff voiced her concerns, Lilley told her that it was not her concern and that Evola would handle the SDS books. In response, Plaintiff reminded Lilley that food safety law required that the SDS books be visible at all times.

117. In November and December 2018, during the peak busy season, there was no quality control employee for the second and third shifts.

118. Instead, Defendant's QA manager, Evola, was working the second and third shifts as procurement which involved counting supplies and Defendant's QA tech was working as a packer on the line.

119. As a result of Evola and the QA tech working procurement and packing popcorn, during the two months of busy season, neither the food products nor the equipment were micro swabbed for listeria, salmonella, E.coli, or Enterobacteriaeceae/Aerobic Plate Count ("EB/APC") testing. Instead of Evola and the QA tech performing their duties on the first shift, a temporary employee was asked to perform various QA duties during the first shift.

120. During that time, the temporary employee approached Plaintiff and asked for help finding the SDS books, in case there was an emergency. Plaintiff attempted to show the temporary employee where the SDS books were normally located, however, they were not there. Plaintiff directed the temporary employee to follow up with Evola for more information on where the books were located.

121.  Plaintiff also emailed Evola, Funaro, and Lilley notifying them about the missing SDS books. She received no response.

122.  Upon belief and all knowledge, to date, the SDS books are still not available for employees.

**Laundry Room Dryer – Fire Hazard**

123.  In August 2018, the dryer in the laundry room caught fire while manufacturing plant employees were using it to dry their freshly washed gloves.

124.  After the fire department arrived to extinguish the fire, the firefighters informed Lilley that the employees could not use the dryer for gloves anymore because the ventilation system was not correctly installed, which created a serious fire hazard.

125.  Throughout the period of August 2018 until Plaintiff's termination in March 2019, Plaintiff observed Defendant's employees continuing to use the dryer to dry gloves. Each time she noticed this Plaintiff told Lilley that this practice needed to stop.

126.  After the fire department's warning, Plaintiff noticed that Lilley instructed a manufacturing plant employee to sit and watch the gloves as they tumbled in the dryer to make sure they did not catch on fire.

127.  Each time Plaintiff noticed the manufacturing plant employee sitting by the dryer, she told Lilley that not only was he not allowed to use the dryer to dry gloves, but also that it was extremely unsafe for the manufacturing plant employee to sit by the dryer while it was operating.

128.  Each time Plaintiff complained to Lilley he told her that the dryer was not her business and that she need not worry about it because he had it under control.

**Termination Based on FSMA Whistleblowing**

129.   Beginning in 2017, after Funaro became Plaintiff's supervisor, aside from one review, her performance evaluations became increasingly negative.

130.   Prior to this time, Plaintiff's performance evaluations were always positive.

131.   In her performance reviews, Funaro stated that Plaintiff always responded negatively about issues that arose at the plant. Funaro's statements referred to her complaints about food safety, OSHA and FSMA violations.

132.   Each time Plaintiff received a negative performance review from Funaro she complained to Nickels. Plaintiff had discussions with Nickels to understand why her performance evaluations became increasingly negative, especially because Funaro never once brought any concerns to Plaintiff's attention. Instead, Funaro always told Plaintiff that she was doing an excellent job.

133.   Plaintiff told Nickels that she was concerned because each time she identified a food safety issue, OSHA, or FSMA violation to Funaro, he would treat her differently by, for example, doing the following:

   a.   Removing and excluding Plaintiff from any company meetings, which she had previously always been invited and encouraged to attend,
   b.   Taking away Plaintiff's formula work and refusing to give her assignments because Funaro assigned them to others (internationally and domestically) who do not have expertise in Plaintiff's field,
   c.   Making Plaintiff teach others how to make formulas, writing ingredient decks, how to run nutritional analysis, how to calculate formulas, and transferring Plaintiff's responsibilities to other employees (line workers and QA Manager) who did not possess an R&D background,
   d.   Removing Plaintiff's international work duties and assigning them to others, like the QA Manager,
   e.   Speaking negatively about Plaintiff to other coworkers such as the QA Manager, Plant Director, Corporate Team and vendor,
   f.   Funaro would not interact or communicate with Plaintiff when he was at the manufacturing plant. He would only communicate with the QA Manager, Director of Manufacturing, Customer Experience team, and line workers,

21

      g.  Funaro would give Plaintiff a negative performance evaluation if she did not agree to his rules.

134.    Each time Plaintiff raised concerns to Nickels, she downplayed Plaintiff's concerns and told her that she "needed to get on [Funaro]'s good side."

135.    Plaintiff was terminated on March 7, 2019 in retaliation for the numerous complaints she made to her supervisors regarding food safety issues, OSHA and FSMA violations, and not refusing to be a part of a QA team that did not follow standards and guidelines.

136.    Based upon all information and belief, Lance Chody, David Funaro, Maneesha Khandelwal, and Kara Nickels jointly made the decision to terminate Plaintiff's employment with input and coordination from Kelly Evola and Austin Lilley. This was because of Plaintiff's complaints about food safety issues, OSHA and FSMA violations, and consistent resistance to corporate management's violations of food safety laws.

## COUNT I – RETALIATION IN VIOLATION OF
## THE FOOD SAFETY MODERNIZATION ACT, 21 U.S.C. § 399d

137.    Plaintiff incorporates the preceding paragraphs by reference herein.

138.    Under the Food Safety Modernization Act ("FSMA"), 21 U.S.C. § 399d, it is unlawful for an employer engaged in the manufacture, processing, or distribution of food to discharge or otherwise discriminate against an employee because she provided to her employer information relating to conduct that she reasonably believed to be a violation of the Food, Drug & Cosmetics Act, or because she objected to, or refused to participate in, such conduct.

139.    Defendant is subject to the anti-retaliation provisions of the FSMA because it is engaged in the manufacture, processing, and distribution of food, including popcorn and chocolates.

140. That at all relevant times, Defendant's CEO, Lance Chody ("Chody") had the power to hire employees, discipline employees, recommend discipline for employees, terminate employees, and recommend termination of an employee in the interests of Defendant.

141. That at all relevant times, Defendant's Vice President of Culinary, David Funaro ("Funaro") had the power to hire employees, discipline employees, recommend discipline for employees, terminate employees, and recommend termination of an employee in the interests of Defendant.

142. That at all relevant times, Khandelwal had the power to hire employees, discipline employees, recommend discipline for employees, terminate employees, and recommend termination of an employee in the interests of Defendant.

143. That at all relevant times, Nickels had the power to hire employees, discipline employees, recommend discipline for employees, terminated employees, and recommend termination of an employee in the interests of Defendant.

144. That at all relevant times, Lilley had the power to recommend discipline and termination of an employee in the interests of Defendant.

145. That at all relevant times, Evola had the power to recommend discipline and termination of an employee in the interests of Defendant.

146. That at all relevant times, Chody and Funaro acted directly or indirectly in the interests of Defendant in relation to Plaintiff's employment.

147. That Plaintiff engaged in protected activity within the meaning of the FSMA on numerous occasions throughout August 2017 until Defendant terminated her employment in March 2019 by reporting her concerns to numerous managers and supervisors, including: Lance Chody, David Funaro, Maneesha Khandelwal, Austin Lilley and Kara Nickels.

148. That Defendant was aware that Plaintiff engaged in protected activity because she complained directly to her supervisors, managers, and coworkers.

149. That beginning in 2016, after David Funaro ("Funaro") became Plaintiff's supervisor, Plaintiff's performance evaluations became increasingly negative.

150. That prior to Funaro becoming Plaintiff's supervisor, her performance evaluations were always positive.

151. That in Funaro's performance evaluations of Plaintiff, he always stated that Plaintiff responded negatively about issues that arose in Defendant's food production plant.

152. That by Funaro's statements in Plaintiff's evaluations, Funaro was referring to Plaintiff's complaints about food safety, OSHA, and FSMA violations.

153. That each time Plaintiff received a negative performance evaluation from Funaro, Plaintiff complained to Kara Nickels ("Nickels"), VP of Human Resources.

154. That following Plaintiff's complaints to Nickels, the two would meet to discuss why Plaintiff received negative performance evaluations, especially because Funaro never once brought any performance concerns to Plaintiff's attention. Instead, Funaro always told Plaintiff she was doing an excellent job.

155. That during these meetings, Plaintiff told Nickels that she was concerned that each time she tried to identify a food safety issue, OSHA, or FSMA violation to Funaro, he would treat Plaintiff differently.

156. That each time Plaintiff raised concerns to Nickels about Funaro's treatment of her, Nickels downplayed the concerns and told Plaintiff that she "needed to get on David's good side."

157. That Plaintiff was terminated on March 7, 2019 in retaliation for the complaints she made to her supervisors about food safety issues, OSHA and FSMA violations, and her refusal to be a part of a team that did not follow federal standards and guidelines.

158. That based upon all information and belief, Lance Chody, David Funaro, Maneesha Khandelwal, and Kara Nickels jointly made the decision to terminate Plaintiff's employment with input and coordination from Kelly Evola and Austin Lilley.

159. That this joint decision was made because of Plaintiff's complaint about food safety issues, OSHA and FSMA violations, and consistent resistance to corporate management violating food safety laws.

160. That Defendant's actions have caused and will continue to cause Plaintiff substantial economic loss, including lost salary, bonuses, benefits, damage to her professional reputation, defamation of character, libel, and slander, and emotional distress.

161. That Defendant's actions have continued to damage Plaintiff's ability to obtain gainful employment, earn a live and provide financial support to her family.

162. That Defendant's actions have continued to damage Plaintiff's reputation.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Aisha Putnam, hereby requests this Honorable Court provide the following equitable and legal remedies for relief:

a. Advance this case on the docket, order a speedy hearing at the earliest practicable date, and cause this case to be expedited in every possible way.
b. Order a permanent injunction prohibiting Defendant from further acts of retaliation.
c. Award Plaintiff all costs of litigation, including reasonable attorneys' fees and expert fees and expenses.
d. Award Plaintiff a judgment against Defendant for lost employment benefits, damages for Plaintiff's inability to secure comparable employment as a result of her termination, emotional distress, mental anguish, punitive damages, and other compensatory damages.
e. Award Plaintiff compensatory damages for the inability to obtain gainful employment to support her family and the severe emotional distress she has experienced.

    f.   Award Plaintiff compensatory damages for all out-of-pocket expenses she incurred as a result of her termination.

    g.   Enter an order requiring Defendant to implement effective steps to eliminate retaliation from Defendant's organization.

    h.   Award Plaintiff a judgment against Defendant for all available damages under the Act.

    i.   Award Plaintiff a judgment against Defendant for all available damages permitted by law.

    j.   Enter a judgment in Plaintiff's favor and against Defendant for retaliation of 21 U.S.C. § 399d.

    k.   Grant such other and further relief as this Honorable Court deems just and proper.

## COUNT II - RETALIATORY DISCHARGE IN
## VIOLATION OF THE PUBLIC POLICY OF THE STATE OF ILLINOIS

163.   Plaintiff incorporates the preceding paragraphs by reference herein.

164.   Count II is being brought for retaliatory discharge in violation of Illinois public policy.

165.   During her employment with Defendant, Plaintiff performed her assigned tasks in a satisfactory and conscientious manner in accordance with Defendant's standards.

166.   At all relevant times during Plaintiff's employment with Defendant, Putnam was supervised by Chody, Khandelwal, Nickels, and Funaro.

167.   During her employment, Plaintiff observed and reported several violations of FSMA and the Occupational Safety and Health Act, 29 U.S.C. 651 *et seq*., to individuals employed by Defendant responsible for addressing and correcting such issues.

168.   In retaliation for reporting violations of law, Plaintiff was terminated by Defendant in retaliation form making complaints about illegal or improper conduct.

169.   Defendant terminated Plaintiff's employment because Plaintiff continued to identify and report safety violations to her supervisors and other employees responsible for addressing these violations.

170.   The aforesaid conduct by Defendant against Plaintiff amounts to retaliation in violating of the law.

171. An inference of retaliatory motive is raised due to the fact that Plaintiff's reports of safety violations and the termination of employment took place in such a short period of time.

172. The issues that Plaintiff raised are each clear mandates of public policy found in federal and Illinois statutes, rules, and regulations.

173. Defendant's retaliation against Plaintiff was motivated by evil motive and intent, and was recklessly and callously indifferent to Plaintiff's legally protected rights.

174. Defendant's actions have caused and will continue to cause Plaintiff substantial economic loss, including lost salary, bonuses, benefits, and other compensation; damage to her professional reputation, defamation of character, libel and slander; and emotional distress.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Aisha Putnam, hereby requests this Honorable Court provide the following equitable and legal remedies for relief:

a. Advance this case on the docket, order a speedy hearing at the earliest practicable date, and cause this case to be expedited in every possible way.
b. Order a permanent injunction prohibiting Defendant from further acts of retaliation.
c. Award Plaintiff all costs of litigation, including reasonable attorneys' fees and expert fees and expenses.
d. Award Plaintiff a judgment against Defendant for lost employment benefits, damages for Plaintiff's inability to secure comparable employment as a result of her termination, emotional distress, mental anguish, punitive damages, and other compensatory damages.
e. Award Plaintiff compensatory damages for the inability to obtain gainful employment to support her family and the severe emotional distress she has experienced.
f. Award Plaintiff compensatory damages for all out-of-pocket expenses she incurred as a result of her termination.
g. Enter an order requiring Defendant to implement effective steps to eliminate retaliation from Defendant's organization.
h. Award Plaintiff a judgment against Defendant for all available damages permitted by law.
i. Grant such other and further relief as this Honorable Court deems just and proper.

Respectfully submitted,
AISHA PUTNAM

/s/ Renee C. Fell

_____
One of Her Attorneys

Uche O. Asonye – 6209522
Renee C. Fell - 6312785
Asonye & Associates
100 North LaSalle, Suite 2115
Chicago, Illinois 60602
(312) 795-9110
uasonye@aa-law.com
rfell@aa-law.com

## JURY DEMAND

NOW COMES the Plaintiff, Aisha Putnam, by and through her attorneys, and hereby demands a trial by jury in the above entitled cause of action.

Respectfully submitted,
AISHA PUTNAM

/s/ Renee C. Fell

_____
One of Her Attorneys

Uche O. Asonye – 6209522
Renee C. Fell - 6312785
Asonye & Associates
100 North LaSalle, Suite 2115
Chicago, Illinois 60602
(312) 795-9110
uasonye@aa-law.com
rfell@aa-law.com