## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

AISHA PUTNAM,

     Plaintiff,

v.

CARAMELCRISP, LLC d/b/a GARRETT
POPCORN SHOPS,

     Defendant.

Case No. 20 C 2074

Hon. LaShonda A. Hunt

## MEMORANDUM OPINION AND ORDER

Plaintiff Aisha Putnam filed this lawsuit against her former employer, Defendant CaramelCrisp, LLC, alleging claims of retaliation in violation of the Food Safety Modernization Act, 21 U.S.C. § 399d, ("FSMA") (Count I) and under Illinois state law (Count II). The Court[1] previously granted Defendant's motion to dismiss the retaliatory discharge claim (Count II). (Dkt. 18). Following completion of all discovery, Defendant moved for summary judgment on Plaintiff's remaining retaliation claim. (Dkt. 121). For the reasons discussed below, summary judgment is denied.

## BACKGROUND

The facts are taken from the parties' Local Rule 56.1 Statements and undisputed unless otherwise noted.[2] Plaintiff began working for Defendant as Associate Director of Research and Development ("R&D") in March 2014. (Pl.'s Resp. to Def.'s SOF ¶ 6, Dkt. 127-2).

---

[1] This case was reassigned to the calendar of Judge Hunt on June 2, 2023. (Dkt. 73).

[2] Defendant argues that Plaintiff's statement of facts fails to comply with Local Rule 56.1 because it (1) includes facts that are not referenced in Plaintiff's response, (2) contains factual and legal arguments, and (3) fails to cite to record evidence in support of Plaintiff's assertions. These objections are noted and the Court "independently determines . . . whether the evidence supports the proposition for which it is cited." *Kotoklo v. DePaul Univ.*, No. 20 C 635, 2021 WL 4477947, at *2 (N.D. Ill. Sept. 30, 2021). In addition, the Court disregards all improper legal arguments raised by both sides in their Rule 56.1 submissions. *See Fetzer v. Wal-Mart Stores, Inc.*, No. 13 C 9312, 2016 WL 792296, at *8 (N.D. Ill. Mar. 1, 2016).

Notwithstanding her job title, Plaintiff's role also encompassed quality assurance ("QA") responsibilities, such as ensuring that food preparation and manufacturing were done safely and in compliance with all relevant laws, identifying and correcting food safety issues, and ensuring that Defendant had the necessary FDA qualifications to process food. (*Id*. ¶¶ 12-14). Pursuant to her job duties,[3] Plaintiff raised concerns regarding QA and food safety throughout her employment with Defendant. (*Id*. ¶¶ 16, 17). From the time she was hired until her termination in March 2019, Plaintiff had three supervisors: Lance Chody, CEO; Tim Gertz, Vice President of Direct Distribution/Facility Management; and David Funaro, Vice President of Global Innovation. (*Id*. ¶¶ 11, 29, 37; Def.'s Resp. to Pl.'s SOF ¶ 2, Dkt. 152).

## I. Plaintiff's Initial Reviews

During her first year of employment, Plaintiff had two performance reviews, a six-month review in November 2014 and an annual review in March 2015. (Pl.'s Resp. to Def.'s SOF ¶ 19). In the six-month review, Chody informed Plaintiff that Defendant was satisfied with her work and that her performance would likely result in a bonus. (*Id*. ¶ 20). Plaintiff's annual review was equally good. (*Id*. ¶ 21). She was rated "Often Exceeds Expectations" in six categories and "Meets Expectations" in the remaining four categories. (*Id*. ¶ 21). In the review, Chody indicated that Plaintiff's work in "QA at shops and [the Offsite Kitchen ("OSK")]" were "highlights" of her performance. (*Id*. ¶ 22). Following her March 2015 review, Plaintiff was promoted to Director of R&D and received a raise and bonus. (*Id*. ¶ 23). As Director of R&D, Plaintiff continued to have QA responsibilities and oversight. (Def.'s Resp. to Pl.'s SOF ¶ 43).[4]

---

[3] The Court did not locate in the record a job description for the Associate Director of R&D position that set forth Plaintiff's specific duties with respect to R&D or QA.

[4] Similarly, the parties do not explain if or how Plaintiff's specific job duties changed with this promotion. Neither side disputes, though, that she maintained QA duties.

## II.    <u>Quality Assurance Support</u>

At some point during her first year of employment, Plaintiff realized that she needed assistance if she was going to continue being responsible for R&D and QA. (Pl.'s Resp. to Def.'s SOF ¶ 24). In a document she prepared for the March 2015 annual review, Plaintiff wrote that she had invested "[l]ots of time" in putting together QA documentation and good manufacturing practices, but going forward, she wanted to focus more closely on R&D, which would allow her to put her "best foot forward in an area of [her] work that [she] enjoy[s] most." (*Id*. ¶ 25). Accordingly, Plaintiff recommended that Defendant hire a dedicated QA professional. (*Id*. ¶ 26). Defendant agreed with Plaintiff's recommendation and gave her authority to hire someone. (*Id*. ¶ 27). The plan was for the new QA professional to report to Plaintiff, who would continue to oversee QA. (*Id*. ¶ 27).

In May 2015, Plaintiff hired Shawn Reed as QA Manager. (*Id*. ¶ 28). Reed originally reported to Plaintiff; however, after about six months, he began reporting to Gertz. (*Id*. ¶ 29). Defendant contends that it changed the reporting structure because it wanted to separate product development from QA. (*Id*. ¶ 30). Nevertheless, Plaintiff asserts that, despite the change, Gertz told her that she could continue overseeing QA because he did not have the requisite certifications or background to do so. (*Id*. ¶¶ 29, 30).

After Reed was hired, Defendant also engaged the services of a third-party consultant, B&D Foods ("B&D"), for assistance with QA. (*Id*. ¶ 31). Specifically, Senior Food Safety Consultant, Lauren Daley, provided consulting services on B&D's behalf. (Def.'s Resp. to Pl.'s SOF ¶ 9). B&D assisted Plaintiff and Reed in developing a food safety program and a Hazard Analysis and Critical Control Points plan. (Pl.'s Resp. to Def.'s SOF ¶ 32). In addition, B&D provided the expertise and tools that Defendant needed to ensure compliance with food safety

laws. (*Id*. ¶ 33). Plaintiff contends that Defendant refused to implement the recommendations made by B&D and others, and instead retaliated against employees who brought such issues to their attention. (*Id*.)

### III.    Plaintiff's 2015 Annual & 2016 Mid-Year Reviews

At some point prior to February 2016, Plaintiff began reporting to Gertz. (Pl.'s Resp. to Def.'s SOF ¶ 34). Thus, in February 2016, Gertz conducted Plaintiff's annual review for 2015 and gave her ratings of "Often Exceeds Expectations" in five categories and "Meets Expectations" in the other five. (*Id*. ¶ 35). Likewise, in his mid-year review of Plaintiff in August 2016, Gertz complimented Plaintiff on her "dedicated role" in helping Defendant pass an audit related to becoming a Costco supplier and noted that Plaintiff had been "very diligent" with respect to recertifications and updating nutritionals. (*Id*. ¶ 36).

### IV.    Plaintiff's 2016 Annual Review

In October 2016, Defendant hired Funaro, and for a while thereafter, Funaro and Gertz jointly supervised Plaintiff. (*Id*. ¶¶ 37, 38). Although Funaro and Plaintiff's interactions were initially limited due to Funaro's travel schedule, Plaintiff concluded early on that Funaro did not like her. (*Id*. ¶¶ 38, 39).

Given Funaro's limited experience with Plaintiff, Gertz prepared her 2016 annual review. (*Id*. ¶ 40). Then, in early 2017, Gertz and Funaro met with Plaintiff to discuss her annual review. (*Id*.) Gertz was more critical of Plaintiff in this review than he had been previously. (*Id*. ¶ 42). In the "Year/To-Date Areas of Opportunity" section, Gertz noted that, since mid-year, Plaintiff had decreased her level of participation at the OSK, had "extracted herself completely" from tasting profiles since the appointment of a new Profile Tasting Manager, and, other than handling two safety incidents "extremely well," had not participated in the 2016 holiday rush at the OSK. (*Id*.

4

¶ 42). Additionally, because Reed voluntarily resigned in December 2016, the review also noted that Plaintiff would be involved in QA until Defendant found a replacement. (*Id*. ¶ 43). Plaintiff wrote a rebuttal to her 2016 annual review, stating that she did not believe the review was a "true representation" of her performance throughout the year. (*Id*. ¶ 44; Ex. D at 138-39, Dkt. 123-5).

## V.    <u>Open QA Position</u>

In 2017, Plaintiff continued in her role as Director of R&D and continued to exercise oversight for QA. (Pl.'s Resp. to Def.'s SOF ¶ 45). She also trained another employee, David Martinez, to assist with QA responsibilities. (*Id*. ¶ 46). For a time, Defendant considered relying on B&D for QA and not backfilling Reed's position, but at some point, Plaintiff asked Funaro to fill the role. (*Id*. ¶¶ 46, 47). Defendant asserts that when Funaro asked Plaintiff to continue providing QA support until the position was filled, Plaintiff told him she no longer wanted any involvement in QA "because there was an abundance of [such] issues, and nobody listened to her complaints or showed any interest in fixing the issues." (*Id*. ¶ 47). However, Plaintiff contends that she "undeniably agreed" to oversee QA while Defendant looked to fill the position. (*Id*. ¶ 47). Plaintiff further claims that Funaro would get mad at her for raising QA issues, even though he had asked her to continue in the QA role until the position was filled. (*Id*. ¶ 48).

## VI.    <u>Plaintiff's 2017 Mid-Year and Annual Review</u>

Funaro conducted Plaintiff's mid-year review in 2017, which was admittedly better than her 2016 annual review. (*Id*. ¶ 49). Funaro wrote that "[Plaintiff] is an incredibly talented, driven individual and brings energy [and] knowledge." (*Id*.) Additionally, Funaro noted that Plaintiff was dedicating "a significant amount of time in . . . ground level QA . . ." (*Id*.) Finally, he commented that Plaintiff was "on track for goals established for her annual review and has shown that her overall value and [sic] an asset to the global organization." (*Id*.)

In February 2018, Funaro gave Plaintiff her annual review for 2017. (*Id*. ¶ 50). He rated Plaintiff as "Often Exceeds Expectations" in seven categories, "Meets Expectations" in another, and "Often Meets Expectations but is [I]nconsistent" in the remaining two categories. (*Id*.) In the "Performance Summary" section, Funaro wrote that "it is a pleasure to have [Plaintiff] as a report." (*Id*. ¶ 51). Plaintiff signed the review without comment. (*Id*.)

**VII.**     <u>**Plaintiff's Complaints**</u>

In April, July, and August 2018, Plaintiff raised various concerns to Funaro; Maneesha Khandelwal, Senior Vice President; Kara Nickels, Vice President Human Resources; and Austin Lilley, Vice President of Manufacturing & Fulfillment. (*Id*. ¶¶ 52, 53). For example, in April 2018, Plaintiff identified a situation where Defendant wanted to have one vendor repackage expiring chocolate that was produced by another vendor. (*Id*. ¶ 55-1).[5] Plaintiff explained that the repackaging could only be done by the original vendor or by a vendor with certain processes in place. (*Id*.) Although Plaintiff advised against it, Defendant moved forward with the repackaging anyway. (*Id*.)

Beginning in July 2018, Plaintiff complained about a leaky roof and ceiling in various areas of the OSK. (*Id*. ¶ 55-2). Plaintiff and B&D purportedly told Lilley about the issue on several occasions, and he told them he would fix the problem. (*Id*. ) Despite further complaints in September 2018 and February 2019, the condition was not corrected. (*Id*.) Plaintiff further contends that when she spoke to Funaro about the issue, he told her, "Let's just focus on our area. Not anyone else's." (*Id*.)

Also in July 2018, Plaintiff responded to an FDA inquiry involving inaccurate labeling. (*Id*. ¶ 56). When she informed management about the issue, Plaintiff was told the labels were in

---

[5] Plaintiff's Response to Defendant's Statement of Facts contains two paragraphs that are labeled as 55. For clarity, the Court refers to the paragraphs as 55-1 and 55-2, respectively.

the process of being replaced. (*Id*.) However, two months later, Plaintiff followed up on the issue only to be told that the labels were not being replaced. (*Id*.)

Plaintiff contends that as she continued to make complaints, Defendant began "stripping and misrepresenting" her responsibilities. (Def.'s Resp. to Pl.'s SOF ¶ 35). Additionally, Plaintiff contends that she was "harassed, ostracized, and isolated to the point where her responsibilities were being reassigned and she was excluded from work meetings and insight into hiring." (*Id*. ¶ 36). Relatedly, Plaintiff asserts that Nickels requested a list of Plaintiff's job responsibilities, which was used to evaluate Plaintiff's position and ultimately justify her termination. (*Id.* ¶ 35).

## VIII. <u>New QA Employee Hired</u>

In September 2018, nearly two years after Reed's resignation, Defendant filled the QA position by hiring Kelly Evola, QA Specialist. (Pl.'s Resp. to Def.'s SOF ¶ 52). The parties dispute whether Evola had a reporting relationship to Plaintiff, with Defendant stating that Evola reported to Lilley and Plaintiff saying that she was expected to train Evola, who had no prior QA experience. (*Id*. ¶¶ 52, 58). Defendant further contends that once Evola started, Plaintiff was expected to turn over all QA responsibilities to Evola, as well as the associated documentation. (*Id*. ¶ 54).

## IX. <u>Plaintiff's 2018 Mid-Year Review</u>

Funaro prepared Plaintiff's final mid-year review in September 2018. (*Id.* ¶ 57). He noted that Plaintiff was "within scope of first half of year goals set in February 2018." (*Id.*) However, he went on to write that he had asked Plaintiff to: "compile a data list of all she has touched in domestic/global [QA] Area since [Reed's] departure. This area of QA competencies is vital in the transition and proper tools needed for QA candidate success. This information was asked prior to our search for a QA representative, and to this document date [sic] still have not received yet."

(*Id.*) Funaro ended the review by stating that he hoped the evaluation would help Plaintiff "shine in her role and responsibilities." (*Id.*)

## X.    Plaintiff's FDA Complaint

On February 21, 2019, Plaintiff submitted an anonymous email to the FDA through an email account she had created under a pseudonym. (*Id.* ¶ 68). Defendant contends that, at the time Plaintiff sent the email, she suspected that she was about to lose her job. (*Id.*) Plaintiff, on the other hand, maintains that she reached out to the FDA at the recommendation of B&D and Daley. (*Id.*) In the email, Plaintiff wrote, "I would like to remain anonymous [sic] for [I] still work at garrett popcorn shops [sic]." (*Id.* ¶ 69). The email referenced a litany of complaints about Defendant's food safety practices. (*Id.*)

On March 3, 2019, Plaintiff sent a follow up e-mail to the FDA from the same email address noting that she had not received a response. (*Id.*) On March 5, 2019, a representative from the FDA responded, stating that the FDA was reviewing the concerns set forth in the complaint. (*Id.*) Defendant asserts that it was not aware of Plaintiff's emails or that any employee had complained to the FDA before it made the decision to eliminate Plaintiff's position. (*Id.* ¶ 70).

## XI.    Plaintiff's Termination

Plaintiff was terminated on March 7, 2019. (Def.'s Resp. to Pl.'s SOF ¶ 49). Defendant claims that several months prior to Plaintiff's termination, there were internal discussions about what to do with respect to Plaintiff's position, as the role she previously held no longer existed since she did not have QA responsibilities. (Pl.'s Resp. to Def.'s SOF ¶ 60). Ultimately, Defendant contends that it made the decision to eliminate Plaintiff's position because she was not doing the job that Defendant needed her to do—R&D—and instead continued to focus on QA, even though Defendant had hired a dedicated QA employee. (*Id.* ¶¶ 58, 61). Plaintiff, on the other hand,

maintains that she continued to have QA responsibilities, including answering QA questions for Defendant's managers, after Evola was hired. (*Id*. ¶ 60). Moreover, Plaintiff asserts that food safety was always within the scope of her position per her job description and her legal obligation as a food safety employee. (*Id*.) Plaintiff's supervisor, Funaro, did not make the final decision to terminate Plaintiff's employment. (*Id*. ¶ 62). Although he was aware of and a part of ongoing management discussions about Plaintiff's role, he was informed about the decision to terminate Plaintiff on March 7, 2019, just before it was communicated to her. (*Id*.)

After Plaintiff's position was eliminated, Defendant did not have a product development employee for over six months. (*Id*. ¶ 65). When Defendant looked to fill the role, it sought a junior level employee; however, Defendant eventually upgraded the position to Associate Director of Product Innovation, which was one step lower than the director role that Plaintiff last held. (*Id*. ¶ 66). Plaintiff contends that the new employee's job responsibilities were not objectively different from hers. (*Id*.) Defendant, however, maintains that Plaintiff's position still does not exist today, as there is no employee who has a job encompassing both oversight for QA and product development. (*Id*. ¶ 64).

## XII.  **Confidential Information**

On March 5, 2019, Plaintiff sent five emails containing forty-three attachments from her work email address to her personal email address. (*Id*. ¶ 72). Additionally, when Plaintiff left the OSK on the day she was terminated, Plaintiff took a jump drive containing additional information. (*Id*. ¶ 73). Defendant learned of Plaintiff's conduct regarding the allegedly confidential information on March 22, 2019. (*Id*. ¶ 75). At that time, Defendant demanded that Plaintiff delete the information, and she complied. (*Id*.) Thereafter, Defendant filed suit against Plaintiff in a case captioned *CaramelCrisp, LLC v. Aisha Putnam,* 19 CV 2699 (N.D. Ill. Apr. 22, 2019) alleging

Plaintiff misappropriated its trade secrets in violation of their Confidentiality and Non-Compete Agreement. (*Id.* ¶ 76). The parties eventually settled that case. (Def.'s Resp. to Pl.'s SOF ¶ 67). But while the trade secret litigation was pending, Plaintiff initiated this retaliation lawsuit on March 31, 2020.[6] In the instant case, Defendant filed a motion for summary judgment, which is fully briefed and ripe for ruling.

## LEGAL STANDARDS

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In cases where the movant does not bear the burden of proof, the movant must simply point to an absence of evidence to support the nonmovant's case. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial," *Celotex*, 477 U.S. at 324, and support their position with "more than a scintilla of evidence." *Conley v. Vill. of Bedford Park*, 215 F.3d 703, 709 (7th Cir. 2000). All facts and inferences are construed in the light most favorable to the nonmoving party. *Nischen v. Stratosphere Quality, LLC*, 865 F.3d 922, 928 (7th Cir. 2017). Additionally, the Court must refrain from weighing evidence or making credibility determinations. *Johnson v. Advocate Health & Hosps., Corp.*, 892 F.3d 887, 893 (7th Cir. 2018).

## DISCUSSION

Plaintiff contends that she received negative performance reviews, was stripped of her job responsibilities, and ultimately terminated for complaining about and reporting Defendant's food

---

[6] In November 2022, Plaintiff also filed a state court action against Defendant alleging violations of the Illinois Whistleblower Act and retaliatory discharge under Illinois law. (Dkt. 74).

safety violations. In response, Defendant argues that Plaintiff cannot prove a causal connection between her complaints and any adverse employment action. Additionally, Defendant contends that even if there is a question of fact on the issue of retaliation, Plaintiff's damages must be limited under the after-acquired evidence doctrine. After reviewing the arguments of the parties and the record, the Court finds that issues of fact remain for resolution by a jury and the scope of damages should be addressed in pretrial submissions.

## I.

The FSMA prohibits employers from retaliating against employees for reporting violations or "reasonably believe[d]" violations of the Federal Food, Drug, and Cosmetic Act ("FD&C"). 29 C.F.R. § 1987.102(b)(1). "[T]he Seventh Circuit has yet to consider the elements of a retaliation claim under the FSMA; indeed, very few courts have considered such a claim to date." *Brown v. Choice Prod., LLC*, No. 20 CV 46, 2021 WL 5038759, at *8 (W.D. Wis. Oct. 27, 2021). Thus, the Court must look to other, similar retaliation claims for guidance, including those arising under Title VII, the ADA, and the ADEA. *Id*. To survive summary judgment, therefore, Plaintiff must present evidence that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two. *Id*. (citing *Luckie v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004)).

Defendant concedes that Plaintiff engaged in a statutorily protected activity[7] and suffered an adverse employment action,[8] but argues that Plaintiff cannot establish causation. To defeat

---

[7] Defendant does contend that "not every complaint Plaintiff made is protected by the FSMA." (Reply at 4, Dkt. 151). For example, Defendant claims that Plaintiff's complaints about Defendant's failure to conduct fire drills had nothing to do with food safety, and therefore, cannot be reasonably viewed as a violation of the FD&C. Plaintiff disagrees, arguing that Defendant has not shown that her belief that she was reporting a violation of the Act is unreasonable. The Court need not determine exactly which complaints should be excluded from consideration, as it clear (and Defendants implicitly agree) that some do fall within the parameters of the FMSA.

[8] Defendant insists that there are only two potentially adverse employment actions at issue here: (1) Plaintiff's 2016 annual review; and (2) the elimination of Plaintiff's position in March 2019. Plaintiff argues that, in addition to

summary judgment, Plaintiff "must offer evidence that a retaliatory motive was a but-for cause of the challenged employment action." *Vavra v. Honeywell Int'l, Inc.*, 106 F.4th 702, 706 (7th Cir. 2024) (internal quotations omitted). In making this showing, an employee may refer to direct evidence or circumstantial evidence, such as "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Adebiyi v. S. Suburban Coll.*, 98 F.4th 886, 892 (7th Cir. 2024) (quoting *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019)). The key question is whether a reasonable juror could conclude that there was a causal link between the protected activity . . . and the adverse action. *Rozumalski*, 937 F.3d at 924.

Plaintiff argues that causation is shown by the (1) the close temporal proximity between her FDA complaint and termination, (2) Defendant's pattern of retaliatory actions, and (3) Defendant's pretextual reasons for her termination. Defendant counters that Plaintiff cannot rely on temporal proximity because Defendant did not know about her FDA complaint and her position was properly eliminated because Plaintiff was not adequately performing her R&D duties.

## II.

"While temporal proximity can sometimes be sufficient to raise an inference of retaliation, the 'general rule' is that 'temporal proximity between an employee's protected activity and an

---

the negative evaluation and her termination, she was stripped of job responsibilities too. In response, Defendant contends that decision was not made "unilaterally," but in response to Plaintiff's request to hire a dedicated QA employee. (Reply at 4). Of course, Plaintiff disputes this characterization of the facts. Assuming Plaintiff is correct, Defendant insists that alone would not constitute an adverse employment action. The Court disagrees. For an employment action to be actionable, it must have left an employee "'worse off' with respect to the terms and conditions of his employment." *Phillips v. Baxter*, No. 23 C 1740, 2024 WL 1795859, at *3 (7th Cir. Apr. 25, 2024) (quoting *Muldrow v. City of St. Louis*, 601 U.S. 346, 359 (2024)). Here, Plaintiff contends that she was taken off several assignments, isolated from QA responsibilities, excluded from meetings, and deprived of input into which employees should be hired. Such actions can certainly constitute an adverse employment action. *See Muldrow*, 601 U.S. at 359 (finding that officer who was removed from a "plainclothes job in a prestigious specialized division giving her substantial responsibility over priority investigations" to a uniformed job "where she was less involved in high-visibility matters and primarily performed administrative work" was subject to adverse employment action).

adverse employment action is rarely sufficient to show that the former caused the latter' without additional facts." *Li v. Fresenius Kabi USA, LLC*, 110 F.4th 988, 998 (7th Cir. 2024) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012)). Despite this rule, Plaintiff contends that causation is established here because she was terminated shortly after her FDA complaint. Defendant, however, maintains that Plaintiff cannot rely on such circumstances because no decisionmaker was aware of Plaintiff's FDA complaint. The Court agrees with Defendant.

A decisionmaker is the person responsible for the contested decision. *Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 807 (7th Cir. 2014). "To retaliate against a complainant, decisionmakers must be aware of the complaint. . . . Speculative assertions about decisionmakers' knowledge are insufficient to establish a genuine dispute about a material fact." *Hamer v. Neighborhood Hous. Servs. of Chi.*, 897 F.3d 835, 841 (7th Cir. 2018). It is not sufficient that a decisionmaker could have or even should have known about the employee's complaint. *Eaton v. J. H. Findorff & Son, Inc.*, 1 F.4th 508, 512-13 (7th Cir. 2021).

Plaintiff has offered no evidence to suggest that Daley, the QA consultant, was involved in the decision to terminate her. Nevertheless, Plaintiff argues that Daley's knowledge should be imputed to Defendant because Daley acted as Defendant's agent when she directed Plaintiff to go to the FDA with her concerns. "Agency is a notoriously fact-bound question, but summary judgment on the existence of an agency relationship is still appropriate when the plaintiff fails to meet her burden in presenting sufficient facts to show that a genuine issue of material fact exists with respect to the agency issue." *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 731 (7th Cir. 2014). "Proof of actual agency requires a showing that (1) a principal/agent relationship existed, (2) the principal controlled or had the right to control the conduct of the agent, and (3) the alleged conduct of the agent fell within the scope of the agency." *Bobin v. Glick*, No. 17 C 9060,

2019 WL 13040641, at *2 (N.D. Ill. Mar. 20, 2019). Here, Defendant argues that Plaintiff fails meet her burden with respect to the second and third elements. The Court agrees.

"The cardinal consideration for determining the existence of an agency relationship is whether the alleged principal has the right to control the manner of work performance." *Kolchinsky v. W. Dairy Transp., LLC*, 949 F.3d 1010, 1013 (7th Cir. 2020). It is undisputed that B&D, for whom Daley worked, contracted with Defendant to provide QA assistance. (Pl.'s Resp. to Def.'s SOF ¶ 31). However, Plaintiff has not pointed to any evidence to suggest that Defendant had the right to control how B&D's work was carried out. Plaintiff argues that Defendant retained control over B&D's work by refusing to take corrective actions in response to reports of food safety violations. But she has failed to cite any legal authority stating that an agency relationship may be found when a principal refuses to act in response to a suggestion from an alleged agent. And nothing in the record here indicates that Defendant possessed the requisite control over its consultant's work.

"To prevail on a claim of actual agency, a plaintiff must also demonstrate that the alleged conduct fell within the scope of the agency relationship." *Thakkar v. Ocwen Loan Servicing, LLC*, No. 15 C 10109, 2019 WL 2161544, at *5 (N.D. Ill. May 17, 2019). Although it is Plaintiff's burden to prove that Daley was acting within the scope of the agency relationship when she directed Plaintiff to go to the FDA, *see Spitz*, 759 F.3d at 731, Plaintiff does not identify any evidence or make any argument regarding the scope of the relationship. Moreover, "[t]his circuit has indicated that acting within the scope of employment means with intent to benefit the employer." *United States v. One Parcel of Land Located at 7326 Highway 45 N., Three Lakes, Oneida Cnty., Wis.*, 965 F.2d 311, 316 (7th Cir. 1992) (internal quotations omitted). As Defendant notes, it would be difficult for the Court to conclude that encouraging an employee to complain to

14

the FDA would provide a benefit to the employer. Thus, Plaintiff has also failed to establish that B&D was acting within the scope of the alleged agency relationship. Absent an agency relationship between Defendant and B&D, Daley's knowledge of Plaintiff's FDA complaint cannot be imputed to Defendant.

Setting aside the agency argument, Plaintiff contends that "[a]ny argument that a defendant planned on terminating an employee without knowledge of their complaint 'cannot serve as a basis for granting summary judgment in its favor.'" (Resp. at 19, Dkt. 127) (citing *Brown*, 2021 WL 5038759, at *8). But that contention is based on a misinterpretation of *Brown*. There, the employer argued that plaintiff could only pursue his retaliation claim based on statements that he made to OSHA in October 2016. 2021 WL 5038759, at *8. However, the evidence established that plaintiff began complaining directly to his employer earlier in May 2016. *Id*. The court thus held that the employer's argument that it was not aware of plaintiff's October complaint until after it made the decision to termination plaintiff could not "serve as a basis for granting summary judgment in [defendant's] favor." *Id*.

A complete reading and analysis of *Brown* demonstrates that the holding was based on a fact specific analysis and that the court did not create a brightline rule. In fact, the Seventh Circuit and numerous courts in this district have held that lack of knowledge of an employee's complaint can serve as a basis for summary judgment on a retaliation claim. *See e.g., Hamer v. Neighborhood Hous. Servs. of Chi.*, 897 F.3d 835, 841 (7th Cir. 2018) (affirming summary judgment in favor of Defendant because Plaintiff did not establish a genuine dispute about decisionmaker's knowledge); *Swidnicki v. Brunswick Corp.*, 23 F. Supp. 3d 921, 934 (N.D. Ill. 2014) ("[L]ack of knowledge is fatal to [plaintiff's] retaliation claim, however, since it is axiomatic that an employer cannot retaliate when it is unaware of any complaints.") (internal quotations omitted); *Sanders v. Chi.*

*Transit Auth.*, No. 19 C 4656, 2022 WL 971879, at \*7 (N.D. Ill. Mar. 31, 2022), *appeal dismissed*, No. 22-1739, 2023 WL 3168672 (7th Cir. Jan. 27, 2023) (finding that there was "no reasonable inference of retaliation" because there was no evidence that the decisionmakers were aware of plaintiff's EEOC filings).

Plaintiff therefore cannot rely on the temporal proximity between her FDA complaint and her termination to establish causation.[9]

### III.

On the other hand, Plaintiff does identify genuine factual disputes as to whether her complaints were connected to other retaliatory behavior by Defendant. Plaintiff contends that after engaging in protected activities, her work was reassigned and she was excluded from meetings, ignored, subject to "hostile criticism, animosity commentary, and harassment[,]" "forced to endure hateful gossiping and belittling comments[,]" and yelled at on several occasions, before ultimately being terminated. (Resp. at 15). An employee may weave together a pattern of many different actions which when viewed as a whole would constitute circumstantial evidence of retaliation, such that a reasonable jury could find a causal connection between the protected activity on the part of the employee and the retaliatory conduct on the part of the employer. *Formella v. Brennan*, 817 F.3d 503, 516 (7th Cir. 2016); *see also Hunt-Golliday v. Metro. Water Reclamation Dist. of Greater Chi.*, 104 F.3d 1004, 1014 (7th Cir. 1997) ("Interpreting the facts in her favor, [plaintiff] can show a pattern of criticism and animosity by her supervisors following her protected activities. A pattern like that presented here supports the existence of a causal link.").

---

[9] Plaintiff suggests that her inability to show that Defendant knew about the FDA complaint before her termination should be excused because the Court denied her request to subpoena documents directly from the FDA. That argument is not compelling. Courts have inherent authority to manage their dockets, especially the discovery process. Plaintiff waited until fact discovery had closed—after nearly 2 years and 5 extensions of time—to suddenly seek what she deemed critical information. (Dkt. 68). The Court acted well within the bounds of its discretion in refusing to accommodate her belated request.

While Plaintiff's response brief and statement of facts are light on specifics about the alleged retaliatory conduct, her deposition testimony in the record is somewhat more illuminating. For example, Plaintiff testified that, on one occasion, Funaro told another employee that Plaintiff was not right for the company and he was going to give that employee projects to move her up, instead of Plaintiff. (Pl.'s Dep. 94:24-95:22, Dkt. 123-5). An isolated comment or stray remark is typically insufficient to create an inference of retaliation, but it may suffice if it (1) was made by the decisionmaker, (2) around the time of the decision, and (3) referred to the challenged employment action. *Mach v. Will Cnty. Sheriff*, 580 F.3d 495, 499 (7th Cir. 2009); *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 644 (7th Cir. 2013). True, Funaro was Plaintiff's supervisor and at some point, some of Plaintiff's job responsibilities were removed. However, Plaintiff offers no details about the timing of this statement. Without knowing when the remark was made, the Court cannot say it alone constitutes evidence of causation. *See Perez v. Transformer Manufacturers, Inc.*, 35 F. Supp. 3d 941, 954 (N.D. Ill. 2014) (finding that comments did not support a finding of retaliation because plaintiff failed to provide any evidence regarding when the comment was made); *Weinberg v. William Blair & Co., LLC*, No. 12 C 09846, 2015 WL 5731637, at *4 (N.D. Ill. Sept. 30, 2015) (same).

Likewise, Plaintiff testified that Funaro told a team of third-party accountants that she did not have a background in quality. (Pl.'s Dep. at 90, Dkt. 123-5). But once again, she does not specify when the comment was made, let alone if it was stated in reference to any adverse employment action.[10] Thus, that evidence has limited value.

---

[10] Plaintiff cites other deposition testimony that does not seem to support her statements that she was harassed and ostracized. (*See e.g.,* Pl.'s Dep. 91:15-92:5 (stating that Plaintiff reported to Chody and Gertz); Pl.'s Dep. 92:13-94:14 (indicating Plaintiff's belief that Funaro did not like her); Pl.'s Dep. 123:15-124:22 (explaining the process for changing flavor profiles)).

Standing alone, these one-off instances may not suffice, but when all the circumstantial evidence about the criticisms of Plaintiff's actions, particularly leading up to her termination, is considered, a reasonable jury could infer that the "job elimination" decision was motivated by retaliatory animus. Indeed, the record is replete with instances of Plaintiff raising QA concerns to Defendant throughout her employment, especially in the months leading up to her termination. Defendant emphasizes that Plaintiff's job responsibilities involved quality control oversight, but only until September 2018 when Evola was hired and Plaintiff was expected to return to R&D duties only. That Defendant may have wanted to end Plaintiff's employment is not illegal, so long as the decision was based on legitimate non-retaliatory reasons.

Plaintiff points out, however, that in early 2019, she continued to complain about various work safety issues that had not been addressed (Pl.'s Dep. at 130-135, Dkt. 123-6). And not long after Evola was hired, Plaintiff told Nickels that she felt retaliated against for bringing up concerns about the plant, in that every time she did do, her duties would be stripped. (*Id.* at 93-97; 105-106). By late February 2019, Funaro refused to talk to her, left her out of discussions, and would not send her emails. (Pl.'s Dep. at 132, 145, Dkt. 123-7). Defendant insists that her supervisor Funaro did not know the final decision had been made to terminate Plaintiff, but the record reflects he was actively involved in the discussions before it happened.

A reasonable jury could find the  timing suspicious here. Within a few months of Plaintiff supposedly failing to give enough attention to her R&D duties, Defendant claims that management began considering eliminating the position altogether because Plaintiff remained too focused on QA work. And then, a few months after that, Defendant concluded that Plaintiff's specific job was unnecessary and fired her; however, within six months, Defendant hired a product development specialist with a different title but apparently similar duties as the prior R&D position. So, after

four years of mostly positive reviews while performing R&D and QA, Defendant determined in a matter of months that Plaintiff was spending too much time on QA such that it no longer needed the R&D role. And management made this call without decisional input from her direct supervisor who had conducted her annual review a few months earlier and raised no serious concerns about her overall job performance. But then Defendant hired a replacement a few months later to work on R&D.

Curiously, neither side explains what Plaintiff's R&D duties entailed before or after September 2018. Still, these facts simply do not add up to judgment as a matter of law in favor of Defendant. In sum, a reasonable jury could conclude that this circumstantial evidence supports a finding of causation. Certainly, Plaintiff will bear the burden of proving her claims at trial. But, at the summary judgment stage, all reasonable inferences are drawn in her favor. She has come forward with just enough evidence to call into question Defendant's actions and its motive for her termination.

"When evaluating a plaintiff's evidence of pretext, it is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was a lie." *Adebiyi*, 98 F.4th at 893 (citing *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 937-38 (7th Cir. 2022)) (internal alterations omitted). "To meet this burden at summary judgment, a plaintiff must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's asserted reasons that a reasonable person could find it unworthy of credence. If an employer's explanation for the challenged employment decision has been shifting or inconsistent, this may be evidence of pretext." *Adebiyi*, 98 F.4th at 893 (internal citations omitted).

Here, the Court agrees with Plaintiff that a reasonable jury could find Defendant's articulated reasons contradictory enough to raise triable issues of fact as to pretext. To recap, Defendant relied on Plaintiff's lack of performance due to her overinvolvement in QA as a justification for firing Plaintiff. As noted above, the record is silent on how Plaintiff specifically fell so short in a matter of months that her job was eliminated. Defendant's only explanation is that "after Evola was hired, [Defendant] expected Plaintiff to focus on R&D, not continue to exercise dominion over QA issues. . . . Yet, when Defendant . . . hired Evola, [Plaintiff] continued to focus on QA and other issues at the expense of her R&D responsibilities. Simply stated, Plaintiff was no longer filling a role that [Defendant] needed, and it eliminated her position as a result." (Def.'s Mem. at 14, Dkt. 122). But Defendant did need someone to fill the duties, as evidenced by the hiring of another product development employee six months later. All that is to say the evidence could support a finding that Defendant fired Plaintiff because she refused to stay out of QA issues, as evidenced by the continued safety complaints she was making after September 2018, not because performance of her R&D duties suffered. Because the record is not clear, Defendant is not entitled to summary judgment on the retaliation claim.

## IV.

Finally, Defendant contends that if it was aware that Plaintiff was sending herself confidential information during her employment, it would have terminated her for that reason alone. Thus, Defendant argues that Plaintiff's damages are barred in whole or in part by the after acquired evidence doctrine. In response, Plaintiff argues that the doctrine does not apply here because she was not in violation of the parties' confidentiality agreement until after her

termination. This is not an issue the Court must resolve on summary judgment. Rather, it is more appropriate to consider in connection with a pretrial motion in limine or at trial.

## **CONCLUSION**

For all the foregoing reasons, Defendant's motion for summary judgment is denied.


**DATED**: November 5, 2024                    **ENTERED**:


_____
LASHONDA A. HUNT
United States District Judge